**Paula SAVELA, Appellant,**

v.

**CITY OF DULUTH, Respondent.**

**No. A09–2093.**

Supreme Court of Minnesota.

Nov. 23, 2011.

---

Shelly M. Marquardt, Don L. Bye, Duluth, MN, for appellant.

John M. LeFevre, Jr., Mary D. Tietjen, and Peter G. Mikhail, Kennedy & Graven, Chartered, Minneapolis, MN, for respondent.

## OPINION

STRAS, Justice.

At issue in this case is the interpretation of approximately 60 collective bargaining agreements (CBAs) between the City of Duluth and its employees. Subject to certain conditions and exceptions, the CBAs guarantee retired City employees health insurance benefits "to the same extent as active employees." The dispute centers on the meaning of that phrase—specifically whether the phrase guarantees health insurance benefits to retirees to the same extent as employees who were active at the time of a retiree's departure, or to the same extent as current City employees. Because we conclude that retirees are entitled to health insurance benefits to the same extent as current City employees, we affirm.

I.

Between 1983 and 2006, the City of Duluth and its employees operated under approximately 60 CBAs covering five bargaining units: Duluth Police Local;

Confidential Employees; City of Duluth Supervisory Association; Local 66 of American Federation of State, County and Municipal Employees (AFSCME) for Basic Unit Employees; and Local 101 International Association of Fire Fighters. Among other things, the CBAs provide for certain health benefits for employees who retired from employment with the City. Each of the CBAs include the following, or materially identical, language regarding retirement benefits, which we will refer to as the "active-employees clause":

> Any employee who retires from employment with the City on or after January 1, 1983, after having been employed by the City for such total time so as to be qualified by such employment to receive retirement benefits from the Public Employees Retirement Association, the Duluth Firemen's Relief Association, or the Duluth Police Pension Association, and who is currently receiving a retirement or disability pension from any such fund, *shall receive hospital-medical insurance coverage to the same extent as active employees, subject to the following conditions and exceptions:* . . . .

(Emphasis added.) Immediately following the active-employees clause, each of the CBAs contain separately numbered or lettered paragraphs listing the various conditions or exceptions to the active-employees clause. Although the specific conditions and exceptions vary among the CBAs, many include the following, or substantially similar, provisions:

> (a) The City will provide any eligible retired employee without claimed dependents the approved fee-for-service coverage or plan 2 coverage, whichever is designated by the employee at the time of retirement, provided active employees, without cost to the retiree.
>
> . . .

> (d) Such coverage shall be for the life of the retiree. . . .

On May 12, 2008, three retired City employees, including appellant Paula Savela, filed a lawsuit in St. Louis County District Court alleging that the City had wrongfully changed or threatened to change their health insurance benefits. In affidavits, the plaintiffs claimed that the City had consistently interpreted the CBAs as freezing health insurance benefits for retirees to the benefits received at the time of retirement. Moreover, according to the affidavits, the City told Savela and others that their health insurance benefits would remain unchanged for the rest of their lives. The court issued a temporary restraining order prohibiting the City from changing the health insurance benefits for retirees until further order by the court.

The parties later stipulated to converting the lawsuit into a class action with Savela as the class representative. The court defined the class in its order as "all Duluth retirees who are former bargaining unit members and who retired from January 1, 1983 through December 31, 2006, and their spouses/dependents who are presently entitled to the retiree health care benefits [under the relevant CBAs]." The stipulation also stated in relevant part:

> There is a live controversy between the City and the Class as to the meaning of the CBA language ("to the same extent as active employees") on the following issue:
>
> > As a matter of contract, are the Class members' health benefits fixed and governed by the plan in place on the date of their retirement or may the City modify the benefits whenever and however benefits for current employees are modified?

The stipulation therefore narrowed the issue in the case to one of contract interpretation, with the class stipulating that it

would not pursue other individualized claims, such as promissory estoppel.

Savela and the City filed competing motions for summary judgment, each arguing that there were no material facts in dispute. The district court granted summary judgment to the City, and denied Savela's motion. The court concluded that the active-employees clause unambiguously granted retirees the same health benefits as current City employees, not the same benefits as employees active on the date of a retiree's departure. The court therefore held that the City was able to "modify the Plaintiffs' benefits whenever and however benefits for active employees are modified." The court also granted summary judgment to the City under a promissory estoppel theory, even though the parties stipulated that the class would not seek relief under that theory.

The court of appeals reversed in part and affirmed in part. *Savela v. City of Duluth,* No. A09–2093, 2010 WL 3632313, at *1 (Minn.App. Sept. 21, 2010). The court reversed the district court's dismissal of the class's putative promissory estoppel claim on the ground that "the issue of promissory estoppel was not before the district court." *Id.* at *4. The court affirmed the district court's interpretation of the active-employees clause, concluding that the term "active employees" referred to current City employees, not employees who were active at the time of a retiree's departure. *Id.* at *3. Resort to extrinsic evidence of intent and past practice was unnecessary, the court held, because the term "active employees" in the CBAs was clear and unambiguous. *Id.* We granted Savela's petition for review, and now affirm.

## II.

We review de novo the district court's grant of summary judgment to the City.

*See Riverview Muir Doran, LLC v. JADT Dev. Grp., LLC,* 790 N.W.2d 167, 170 (Minn.2010). In reviewing the district court's grant of summary judgment, our task is to determine whether genuine issues of material fact exist, and whether the district court correctly applied the law. *Id.* Because CBAs are contracts, *see Hous. & Redev. Auth. of Chisholm v. Norman,* 696 N.W.2d 329, 337 (Minn.2005), proper interpretation of them is a question of law that is subject to de novo review, *see Halla Nursery, Inc. v. City of Chanhassen,* 781 N.W.2d 880, 884 (Minn.2010).

The issue in this case is narrow, and the material facts are not in dispute. Although there are approximately 60 different CBAs covering five different bargaining groups, each of the CBAs contains an active-employees clause. The parties, in stipulating to the class action, identified the active-employees clause as the "live controversy" for judicial resolution. In addressing the limited breach of contract claim asserted by the class, we take no position on whether the City promised certain retirees that their health benefits would remain unchanged for the rest of their lives, nor do we address the wisdom of the City's plan to move all employees and retirees into a single health insurance plan.

## A.

When interpreting a contract, we look to its language to determine the parties' intent. *Dykes v. Sukup Mfg. Co.,* 781 N.W.2d 578, 582 (Minn.2010). In other words, "[w]here there is a written instrument, the intent of the parties is determined from the plain language of the instrument itself." *Travertine Corp. v. Lexington–Silverwood,* 683 N.W.2d 267, 271 (Minn.2004). Accordingly, we assign unambiguous contract language its plain

meaning. *Metro. Airports Comm'n v. Noble,* 763 N.W.2d 639, 645 (Minn.2009).

As argued and framed by the parties, the resolution of this case turns on the active-employees clause, which states in relevant part: "Any employee who retires from employment with the City . . . shall receive hospital-medical insurance coverage to the same extent as active employees, subject to the following conditions and exceptions." To narrow the question further, this case effectively turns on the meaning of the phrase "active employees." Savela argues that "active employees" refers to employees who were active at the time of a retiree's departure. In contrast, the City claims that "active employees" refers to current City employees. We agree with the City.

During the entire 24–year period in which the various CBAs have governed the relationship of the parties, the term "active" has been synonymous with the term "current." *The American Heritage Dictionary of the English Language* 17 (4th ed. 2009) ("Currently in use or effect"); *see also Black's Law Dictionary* 32 (6th ed. 1990) ("That is in action; that demands action; actually subsisting; the opposite of passive."); *Black's Law Dictionary* 31 (5th ed.1979) (same). In other words, "active" employees are those employees that are currently "engaged" or "participating" in employment with the City. *The American Heritage Dictionary of the English Language* 18 (3rd ed. 1992) ("Engaged in activity; participating: *an active member of a club.*"); *Webster's Third New International Dictionary* 22 (2002) ("[E]ngaged in an action or activity: PARTICIPATING <an [active] club member>"); *Webster's Third New International Dictionary* 22 (1976) (same). The City's position, therefore, is consistent with the common and accepted meaning of the word "active." [1]

■ Savela's proposed interpretation, by contrast, would require us to add words to the active-employees clause. Specifically, Savela's proposed interpretation requires us to change the phrase "active employees" to "active employees at the time of retirement" or "then-active employees." However, "[w]e have consistently stated that when a contractual provision is clear and unambiguous, courts should not rewrite, modify, or limit its effect by a strained construction." *Valspar Refinish, Inc. v. Gaylord's, Inc.,* 764 N.W.2d 359, 364–65 (Minn.2009) (citing *Telex Corp. v.*

1. Justice Paul H. Anderson's dissent argues that the phrase "active employees" is ambiguous because, even if "active" means "current" or "participating," the active-employees clause could be referring to employees who were "current" employees of the City when a retiree departed during the effective period of the CBAs. We disagree for two reasons. First, there is nothing in the CBAs (and certainly nothing in the active-employees clause) to support the dissent's suggestion that the phrase "active employees" refers to employees who were active on any specific date in the past. Second, the dissent's alternative interpretations of the term "active," though plausible, are not reasonable. To use the example in Justice Anderson's dissent, if a statute were to refer to the "current Minnesota Governor," we would not interpret that phrase to refer to some governor who served in the past even if the statute was enacted in 1983, the year when the parties ratified some of the CBAs in this case. Similar to the temporal scope of a statute, this contract was indisputably intended to govern the contractual obligations of the City to its retirees for as long as the retirees shall live, not for some discrete time period in the past. For these reasons, the alternative interpretations of the "active employees" clause advanced by Justice Anderson are unreasonable and do not create an ambiguity sufficient to survive summary judgment. *See Columbia Heights Motors, Inc. v. Allstate Ins. Co.,* 275 N.W.2d 32, 36 (Minn.1979) ("[We] must fastidiously guard against the invitation to create ambiguities where none exist." (citation omitted) (internal quotation marks omitted)).

*Data Prods. Corp.*, 271 Minn. 288, 294–95, 135 N.W.2d 681, 686–87 (1965)).

Accordingly, we conclude the only reasonable interpretation is that the CBAs guarantee to retirees the same health insurance benefits as current City employees.[2]

### B.

Savela nonetheless argues that our interpretation of the active-employees clause is inconsistent with other provisions of the CBAs.[3] In particular, Savela claims that our interpretation of the CBAs is inconsistent with the various "conditions and exceptions" that follow the active-employees clause. Specifically, Savela notes that one of the conditions placed upon the active-employees clause in some of the CBAs requires retirees to select a single insurance plan at the time of retirement. The 2004–2006 Local 66 AFSCME Basic Unit Employees CBA, for example, states that certain retirees are entitled to one of two health insurance plans, "whichever is designated by the employee at the time of retirement, provided active employees." Another condition found in all of the CBAs provides that "[s]uch coverage shall be for the life of the retiree." Taken together, Savela argues that these two conditions support her interpretation that the active-employees clause refers to employees who were active at the time of a retiree's departure. We disagree.

The clause requiring a retiree to select a single health insurance plan at the time of retirement does not guarantee the retiree the selected plan throughout retirement. That initial election of a health insurance plan is effective for as long as the City offers the selected plan to current City employees. Indeed, the provision relied upon by Savela repeats the requirement of the active-employees clause that the plan a retiree initially selects also be "provided active employees." Reading both clauses together supports our interpretation that the City is required only to provide retirees the same health benefits that are available to current City employees. Any other interpretation would require us to add words to both the active-employees clause *and* the clause requiring an initial selection of a health plan by a retiree.

Moreover, the fact that "[s]uch coverage shall be for the life of the retiree" adds little to our interpretive task here. The City does not dispute that it must provide health insurance coverage to a retiree for life; rather the parties dispute the *content* of that coverage. In accordance with our

---

2. We take no position on whether the City could cancel health insurance benefits for retirees by eliminating such benefits for current City employees because this case does not present that question.

3. Both dissents rely on the interpretive rule that we must construe the active-employees clause with reference to the CBAs as a whole. *See Chergosky v. Crosstown Bell, Inc.*, 463 N.W.2d 522, 525 (Minn.1990). We agree. In accordance with that rule, we have examined the entire record in this case—including those portions of the approximately 60 CBAs that are available in the record—which leads us to the conclusion that there is only one reasonable interpretation of the CBAs: retirees are entitled to the same health insurance benefits provided to current City employees. *See Offerdahl v. Univ. of Minn. Hosps. & Clinics*, 426 N.W.2d 425, 427 (Minn.1988) ("On an appeal from summary judgment, the role of the reviewing court is to review the record for the purpose of answering two questions: (1) whether there are any genuine issues of material fact to be determined, and (2) whether the trial court erred in its application of the law."). The dissents' discussion of numerous other provisions of the CBAs, some of which are unrelated to health benefits, does not alter our conclusion that the outcome of this case effectively turns on the interpretation of the active-employees clause, which has been the view of the parties throughout this litigation.

interpretation of the active-employees clause, the health insurance coverage that the CBAs guarantee "for the life of the retiree" is the coverage provided to current City employees, not the coverage initially selected by a retiree.[4]

In addition to Savela's arguments, Justice Paul H. Anderson advances two novel reasons why, in his view, the CBAs are ambiguous with respect to the scope of health insurance benefits for retirees. First, Justice Anderson argues that the active-employees clause may implicitly cross-reference a "more specific" section in the CBAs governing health insurance benefits for employees covered by the CBAs. As an initial matter, Justice Anderson's dissent acknowledges that the employee health insurance section on which it relies appears in very few of the CBAs. More fundamentally, however, Justice Anderson fails to point to any specific language supporting his alternative interpretation of the CBAs, and we can find none. *See Columbia Heights Motors, Inc. v. Allstate Ins. Co.*, 275 N.W.2d 32, 36 (Minn.1979) ("[We] must fastidiously guard against the invitation to create ambiguities where none exist." (citation omitted) (internal quotation marks omitted)). Indeed, the employee

health insurance section discussed by Justice Anderson never uses the phrase "active employees" when referring to the health insurance benefits available to employees covered by that particular CBA. Therefore, nothing in the CBAs suggests that the active-employees clause can reasonably be interpreted to incorporate the details of the section describing the plans.

Second, Justice Anderson claims that the CBAs are ambiguous because there *could* be a conflict between the active-employees clause and the requirement in some CBAs that retirees receive "the approved fee-for-service coverage provided active employees." The flaw in Justice Anderson's argument is straightforward. By its terms, the aforementioned clause from the CBAs requires the City to provide fee-for-service coverage to retirees only as provided to active employees. If the City eliminates fee-for-service coverage, then the City no longer has a contractual obligation to provide such coverage for retirees. Accordingly, there is no conflict, potential or otherwise, between the active-employees clause and the requirement that retirees receive "the approved

---

4. Justice Meyer argues that the phrase "[s]uch coverage shall be for the life of the retiree" likely refers to the specific coverage options listed in the conditions and exceptions that follow the active-employees clause. Specifically, Justice Meyer interprets "such coverage" as a likely reference to the health insurance coverage option designated by retirees at the time of their departure rather than to the "hospital-medical insurance coverage" guaranteed by the active-employees clause. We disagree.

When used as a demonstrative adjective, as it is here, the word "such" refers back to an antecedent category of persons or things. *See, e.g., Commonwealth v. McClintic*, 589 Pa. 465, 909 A.2d 1241, 1250 (2006) ("Use of the word 'such,' a demonstrative adjective, refers to an antecedent, or a category of things previously mentioned."); Bryan A. Garner,

*Garner's Modern American Usage* 758 (2003) (describing the use of "such" as a demonstrative adjective). Structurally, the only reasonable interpretation of the phrase "such coverage" is that it refers only to the coverage described in the active-employees clause, which is the antecedent that immediately precedes the colon. In other words, each of the various conditions and exceptions modify only the active-employees clause, not the other conditions and exceptions appearing in the paragraphs below the active-employees clause. Other than asserting ambiguity, the dissents do not provide a grammatical, textual, or structural reason to interpret the conditions and exceptions in any other manner. Accordingly, it is unreasonable to read "such coverage" as a reference to the specific health insurance coverage option selected by retirees at the time of their departure.

fee-for-service coverage provided active employees."

### C.

█ We also disagree with Savela that our decision today is foreclosed by *Housing & Redevelopment Authority of Chisholm v. Norman,* 696 N.W.2d 329, 337 (Minn.2005). In *Norman,* we concluded "a promise by a public employer, embodied in a CBA, to pay health insurance premiums for an employee who retires during the term of the CBA is enforceable on contract grounds." *Norman,* 696 N.W.2d at 337. *Norman* stands for the proposition that the right to retiree benefits provided in an operative CBA vests when an individual retires. Neither party disputes that members of the class have a vested right to health insurance benefits under *Norman.* Rather, the parties dispute the substance of that right.

The substance of the vested right is defined by the terms of the CBA. *See id.* (looking to the CBA to determine what the public employer was obligated to pay). In *Norman,* the CBA in question guaranteed health insurance benefits to retirees under "*the existing* hospital medical, surgical, drug and dental programs covering employees of the CHRA." *Id.* (emphasis added) (internal quotation marks omitted). Here, the CBAs do not guarantee health benefits to retirees under "the existing" insurance plans; rather, the CBAs in this case guarantee retirees health benefits "to the same extent as active employees." Therefore, our decision today is consistent with *Norman*'s requirement that the substance of a retiree's vested right to health insurance benefits is determined under the plain language of the CBA in operation at the time the retiree departs.

### III.

For the foregoing reasons, we conclude the CBAs unambiguously guarantee health insurance benefits to retirees to the same extent as current City employees. Accordingly, we affirm the decision of the court of appeals.

Affirmed.

ANDERSON, PAUL H., Justice (dissenting).

I respectfully dissent. I disagree with the majority's conclusion that the language in the approximately 60 collective bargaining agreements (CBAs) between the City of Duluth and its employees is unambiguous. There is more than one reasonable interpretation of the CBAs at issue. Therefore, I would conclude the CBAs are ambiguous and would reverse the district court's decision to grant the City's summary judgment motion and remand to the district court for a determination of the CBAs' meaning.

Before I get into the reasons why I disagree with the majority's analysis, it is important to describe what this case is about. This case is about the interpretation of contracts, more particularly, the interpretation of approximately 60 CBAs entered into between the City and its employees following arms-length negotiations. This case is not about a change of statutes or ordinances, nor is it about one party— i.e., the City—being in default on its obligations. This is simply a case about contract interpretation.

It is also important to understand the procedural posture of this case. It comes to us following the district court's grant of the City's summary judgment motion. The City, in its motion, asserted that there are no facts in dispute and there is no

ambiguity with respect to any of the approximately 60 CBAs. The district court agreed with these assertions. I disagree. The bottom line for me in this case is that after reviewing the approximately 60 CBAs between the City and its employees, I conclude that there are factual matters in dispute which need a further hearing at the district court in order to resolve the ambiguities in the CBAs.

We review a district court's decision regarding summary judgment de novo. *Premier Bank v. Becker Dev., LLC*, 785 N.W.2d 753, 758 (Minn.2010). Our goal in contract interpretation is "to ascertain and enforce the intent of the parties." *Valspar Refinish, Inc. v. Gaylord's, Inc.*, 764 N.W.2d 359, 364 (Minn.2009). Importantly, to ascertain the intent of the parties we look to the contract as a whole. *See Halla Nursery, Inc. v. City of Chanhassen*, 781 N.W.2d 880, 884 (Minn.2010) ("[T]he terms of a contract are not read in isolation."). The intent of the parties is not ascertained "by a process of dissection in which words or phrases are isolated from their context, but rather from a process of synthesis in which the words and phrases are given a meaning in accordance with the obvious purpose of the contract * * * as a whole." *Motorsports Racing Plus, Inc. v. Arctic Cat Sales, Inc.*, 666 N.W.2d 320, 324 (Minn.2003) (quoting *Republic Nat'l Life Ins. Co. v. Lorraine Realty Corp.*, 279 N.W.2d 349, 354 (Minn.1979)) (alteration in original). A contract is ambiguous when the language is susceptible to more than one reasonable interpretation. *Dykes v. Sukup Mfg. Co.*, 781 N.W.2d 578, 582 (Minn.2010). Therefore, we must look at the CBAs as a whole to determine if there is more than one reasonable interpretation,

and we must not isolate the active-employees clause from the remaining portions of the CBAs.

Both parties assert that the CBAs unambiguously support their respective positions. Savela argues that the CBAs unambiguously require the City to provide health insurance benefits to retirees for life, and that the City is obligated to provide those benefits at the same level the retiree received those benefits at the time of his retirement. The City agrees that the CBAs unambiguously require the City to provide health insurance benefits to retirees for life, but argues that it is obligated only to provide those benefits at the same level at which the City provides benefits to its present-day employees. At this preliminary stage in the proceedings, it is not possible to determine which argument should ultimately prevail because the CBAs are subject to more than one reasonable interpretation. More information is required before this case can be properly resolved.

I begin my analysis by noting that the majority omits describing certain critical historical circumstances surrounding the agreement by the City to provide retirees with the health insurance benefits in dispute. A more complete picture of the circumstances under which the employees and the City agreed to the retiree benefits in dispute will help clarify the context of the current dispute. Savela submitted a number of affidavits detailing the history of the City's retiree health insurance benefits; but none of the allegations contained in the affidavits has been established—either shown to be true or discredited—at this stage of the proceedings.[1]

1. The City objected to the submission of some of the affidavits on hearsay and lack-of-foundation grounds. The district court considered the affidavits with respect to the promissory estoppel claim, but did not use the affidavits in deciding the contract issue. I do not use the affidavits to decide whether the CBAs are ambiguous, but merely to illustrate the history of the dispute before our court.

According to an affidavit from three individuals involved on the employees' side of the negotiations in 1983, before the current retiree health insurance provision was in effect the City paid health insurance premiums for retirees based on accumulated sick leave. A federal regulation took effect around the time of the 1983 negotiations that required the City to show projected costs or payables for then-existing contract obligations. As a result of changes in certain regulations, the City offered its employees the new retiree health insurance benefit that is in dispute. The City did so because it wanted "to avoid the political consequences of that newly required negative for budgeting purposes." But the City discovered that the new health insurance benefit would cost the City more than the old one. Therefore, the City offered the employees' negotiating committee the alternative of either a 1 percent wage increase with the old health insurance system intact, or a 2 percent wage decrease with the new retiree health insurance benefits. The new retiree health insurance system was adopted by the City and its employees.

After the new health insurance benefits language was adopted, the City arguably interpreted and applied the CBAs to require the City to provide health insurance benefits to retirees for life at the same level as when the retiree retired. According to the City's former Employee Benefits Administrator, between 1985 and 2005, the City went from providing two health insurance plans—one a fee-for-service plan and the other a HMO plan—to providing up to 129 different variations of its health insurance plans. The variations between the plans included differing co-pays, deductibles, and life qualifying events. Savela contends that the accumulation of so many different variations of its plans shows that the City, until only recently, had interpreted the CBAs as requiring the City to provide retirees with health insurance benefits frozen at levels they received on the date of their retirement. The City counters that the accumulation of the different variations in its plans is consistent with its position that the City only is required to provide plans that are available to present-day employees.

The majority dismisses Savela's interpretation of the CBAs—that the CBAs guarantee retirees health insurance benefits at the same level as the day they retired—as unreasonable and states that the majority's interpretation is the only reasonable interpretation. The majority concludes that a reasonable interpretation of the CBAs is that retirees would only receive health insurance benefits identical to those of current City employees. I concede that the majority's interpretation of the CBAs is reasonable, but the majority falls far short of the mark in its efforts to support its conclusion that Savela's alternate interpretation of the CBAs is not reasonable and therefore that the CBAs are unambiguous.

There are at least four components of the CBAs that render them ambiguous with regard to the health insurance benefits guaranteed to retirees. Even though each component individually should be enough to render the CBAs ambiguous, when all four components are considered together there is strong, if not overwhelming, evidence of ambiguity. First, the active-employees clause, which is present in some form in all of the CBAs, is nonspecific about the time to which it refers. The active-employees clause states:

Any employee who retires from employment with the City on or after January 1, 1983, after having been employed by the City for such total time so as to be qualified by such employment to receive retirement benefits from the Public Em-

ployees Retirement Association, the Duluth Firemen's Relief Association, or the Duluth Police Pension Association, and who is currently receiving a retirement or disability pension from any such fund, shall receive hospital-medical insurance coverage to the same extent as active employees, subject to the following conditions and exceptions. . . .

As the majority notes, "active" tends to mean "current" or "participating." But it is not enough to say that "active" means "current," because "current" still must refer to a specific time frame to have any meaning. For example, if a newspaper article refers to "the current Minnesota Governor," it is unknown which governor the article references without knowing more details, such as the publication date of the article. The same is true of the active-employees clause. Without context, "active" or "current" employees as used in the CBAs could mean "current" on a specific date in the past.

It is essential for any court deciding this case to answer the following question: what is the exact time period to which the active-employees clause refers? Is it active as of the date the CBA took effect, active as of an employee's retirement date, active as of the present time, or active as of some other time? When we look to a CBA as a whole, we find that the majority's answer to this question is not the only reasonable answer. In his dissent at the court of appeals, Judge Stauber noted that the CBAs only cover employees who are "active" during the effective period of the CBA, a 1- to 3-year span. *See Savela v. City of Duluth,* No. A09–2093, 2010 WL 3632313, at *6 (Minn.App. Sept. 21, 2010) (Stauber, J., dissenting). Therefore, when a CBA uses the term "active employees," it could be referring to only those employees who are active during the effective dates of the applicable CBA, rather than future employees who are not covered by the CBA in effect. The majority only notes that there is no language limiting the term "active" to "then-active." But the majority's analysis works just as well to support ambiguity because, as Judge Stauber states, there is also no language limiting the term "active" to "now-active." *See id.* at *5. Thus, even using the majority's analytical framework, the active-employees clause can be reasonably interpreted to mean both "then-active" and "now-active," and therefore the clause is ambiguous.

Second, "active employees" could be interpreted as being merely a descriptive term rather than a term designed to tie the retirees' health insurance rights to an actual group of employees. As the City acknowledges in its brief, "[t]he contract promise at issue is stated at a level of detail no greater than the *plan* level." A reasonable interpretation of the active-employees clause—when considered alongside the lack of details provided in the retiree health insurance section and the greater details provided in the employee health insurance section [2]—is that the active-employees clause was meant to incorporate the details of the insurance plan from another section of the CBAs.[3] Therefore,

---

2. The employee health insurance section can be found in the 2004–2006 Duluth Police Local CBA. Few of the other CBA excerpts, if any, contain this section.

3. The majority faults the dissent for not "point[ing] to any specific language" from the CBAs in support of its analysis. But the majority misinterprets the point being made by the dissent. If there was specific language

supporting the dissent's argument, language in the CBAs would unambiguously support Savela's interpretation and the CBAs would not be ambiguous. But the dissent was not able to find specific language that supports either the City's or Savela's interpretation of the CBAs. It is precisely because there is no specific language supporting the positions of the parties that the dissent must look to other

the "active employees" language can reasonably be interpreted to simply incorporate the details of the section describing the plans. Viewing the active-employees clause as a method of incorporating a more specific provision of the CBA reinforces the reasonable alternative interpretation that the active-employees clause refers to employees subject to the applicable CBAs rather than present-day City employees.

Third, under the majority's interpretation, the CBAs do not state which provision will control in the event of a conflict. The CBAs, in addition to stating that retirees shall receive the health insurance plan provided active employees, also state that retirees shall receive a specific health insurance plan or must select one plan from a list of options. The CBAs do not indicate which requirement should control in the event that the listed plans are no longer provided to present-day employees. For example, some of the CBAs state that retirees without claimed dependents would receive "[t]he approved fee-for-service coverage provided active employees." But the majority does not note why one clause of the provision—"provided active employees"—trumps the other clause of the provision—the "fee-for-service coverage"—when the two are in conflict with each other. In other words, if the City stops providing the fee-for-service coverage to its present-day employees, even under the majority's interpretation it is unclear what the City is obligated to do under the CBA. Is the City required to (1) stop providing the retirees with the fee-for-service coverage and continue to provide retirees with the plan given to present-day employees, or is it required to (2) stop providing the retirees with a plan provided present-day employees and continue to provide retirees with the fee-for-service coverage? Despite

the lack of language dictating the answer to this critical question, the majority would conclude that the only reasonable interpretation is that the City can stop providing the fee-for-service coverage to retirees when it no longer provides that coverage to its present-day employees. But I fail to see how this conclusion is dictated by the language of the CBAs.

Fourth, the CBAs state that "[s]uch coverage shall be for the life of the retiree." The majority concludes that the term "such coverage" refers to the insurance plan that the City provides to present-day employees. But "such coverage" could just as readily refer to the specific plan listed in the CBA, or the plan chosen by the retiree at the time of retirement. Again, the language of the CBA does not explicitly answer this question, yet the majority concludes that its conclusion is the only reasonable interpretation.

An additional factor important to any analysis of the meaning of the CBAs is that one can arrive at reasonable alternative interpretations of the CBAs without reading words into the CBAs or relying on extrinsic evidence. Ambiguity is apparent simply by reading the CBAs as a whole. But the extrinsic evidence provided by Savela is notable for its consistency with a conclusion of ambiguity based on the CBAs' language. Savela's reasonable alternative interpretation is consistent with the way the City has arguably interpreted the CBAs for approximately 25 years. Moreover, the CBAs were interpreted in a manner that gave rise to, as the City describes in its response to Savela's petition for review, a "morass of conflicting extrinsic evidence." It seems unlikely that approximately 60 CBAs with only one reasonable interpretation—as the majority

provisions of the CBAs in search of clarity. In this search, the dissent found no clarity but

did find other reasonable interpretations for the term "active employees."

holds—would lead to a "morass of conflicting extrinsic evidence."

Additionally, the majority's conclusion would allow the City to completely eliminate the retirees' health insurance benefits by removing health insurance for its present-day City employees. The City conceded as much during oral argument when it stated that "if coverage is not available for active employees then it is not available for retirees either." Indeed, the majority affirms the district court, which concluded that "[t]he City may modify the Plaintiffs' benefits *whenever and however* benefits for active employees are modified." (Emphasis added.) Moreover, the present-day employees' bargaining unit no longer represents the retirees, even though that bargaining unit will, under the majority's analysis, be essentially negotiating what the retirees' health insurance benefits will be. If the present-day employees are offered a better deal that excludes health insurance benefits, they may accept such a deal without regard to the affected retirees. Therefore, there appears to be nothing that would prevent the City from removing all health insurance benefits for its present-day employees and, by extension, removing the retirees' health insurance benefits.

The City claimed at oral argument that the only way the City would not provide health insurance coverage to its employees would be "a federal takeover or a financial disaster." But this possibility may not be as remote as the City makes it out to be. Hopefully, we are now in the process of emerging from a serious economic recession, a recession that has caused several states to rethink their pension and health care liabilities. In fiscal year 2009, "the gap between the promises states made for employees' retirement benefits and the money they set aside to pay for them grew to at least $1.26 trillion," which was a 26 percent increase in one year. The Pew Ctr. on the States, *The Widening Gap: The Great Recession's Impact on State Pension and Retiree Health Care Costs* 1 (2011). For retiree health care and other benefits, states had saved less than 5 percent of their total liability. *Id.* at 5. The study done by the Pew Center on the States appears to list Minnesota as one of 19 states that set aside no funds for retiree health care liabilities. *Id.* at 6. Because of the failure to set aside funds to pay for the benefits that were contractually given, states have begun taking legislative steps to either reduce benefits or increase employee contributions. *Id.* at 7.

At the state level, there have been a few attempts to revise the pension benefits of state workers even after they have vested. Colorado recently attempted to modify the pension benefits granted to current employees as well as those who had already retired. Whitney Cloud, Comment, *State Pension Deficits, the Recession, and a Modern View of the Contracts Clause,* 120 Yale L.J. 2199, 2202 (2011). Before Colorado, attempts to modify retiree benefit agreements were also made in Alabama and Arizona. *Id.* at 2202 n. 19. Moreover, the phenomenon of attempting to reduce vested pension rights is not new to the most recent economic climate; it has been going on for quite some time. *See* Note, *Public Employee Pensions in Times of Fiscal Distress,* 90 Harv. L.Rev. 992, 993 (1977). Given that states have already attempted to alter pension benefits after retirees have earned them, it does not appear a remote possibility that the City would at some point attempt to eliminate health insurance benefits for its present-day employees. Under the conclusion reached by the majority, the City would eliminate all such benefits for the retirees.

For all of the foregoing reasons, I would conclude that the language in the approxi-

mately 60 CBAs guaranteeing retiree health insurance benefits is ambiguous; therefore, I would reverse the district court and remand to the district court for further proceedings to determine the meaning of the CBAs.

PAGE, Justice (dissenting).

Because I conclude that the contracts at issue are ambiguous, I join the dissents of both Justice Paul H. Anderson and Justice Helen M. Meyer.

MEYER, Justice (dissenting).

I respectfully dissent. The majority frames the issue incorrectly as a narrow one: the meaning of an active-employees clause in 60 collective bargaining agreements (CBAs) between the City of Duluth and its employees. I would correctly frame the issue as the district court stated it in its May 12, 2009, Order for Class Certification: "As a matter of contract, are the Class members' health benefits fixed and governed by the plan in place on the date of their retirement or may the City modify the benefits whenever and however benefits for current employees are modified?" In answering the correct issue, I would not limit the analysis to the meaning of only one term in the contract, "active employees," isolating the term from the rest of the terms of the contracts. Rather,

I would apply established rules of contract interpretation, and consider the terms of the contract as a whole to determine whether the City may modify a retiree's health benefits whenever and however benefits for current employees are modified. I would conclude that the contracts are ambiguous. Therefore, I would reverse the court of appeals and remand to the district court for trial.

## I.

Paula Savela is the class representative in a class action brought in 2008 on behalf of all former Duluth city employees (and their spouses and dependents) who retired between January 1, 1983, and December 31, 2006, and are entitled to retiree health benefits under a series of negotiated collective bargaining agreements.[1] At issue in the litigation is the right of the City of Duluth, under the terms of the various collective bargaining agreements, to modify health benefits for members of the class, that is, for retired employees. These 60 CBAs[2] all include similar language. For example, the agreement in effect between the City and AFSCME between 2004 and 2006 includes the following provision:[3]

23.1 Any employee who retires from employment with the City on or after

---

1. The CBAs involved are between the City of Duluth and the Duluth Police Union, Local 807 (Duluth Police Local); Confidential Employees; City of Duluth Supervisory Association (Supervisory Association); Local 66 of AFSCME Council 5 (formerly Council 96) for Basic Unit Employees (AFSCME); and Local 101 International Association of Fire Fighters (Fire Fighters Local 101).

2. The record contains parts of 60 CBAs for the five unions: 13 between the City and Duluth Police Local; 12 between the City and Confidential Employees; 11 between the City and Supervisory Association; 12 between the City and AFSCME; and 12 between the City

and Fire Fighters Local 101. These 60 contracts collectively cover the entire class period except for 2003 for Duluth Police Local. If there is a 61st CBA covering that year, it is not in the record.

3. All 60 CBAs include the phrase "[s]uch coverage shall be for the life of the retiree." In addition, all 60 CBAs follow the format of describing the coverage available to retired employees and then stating that "[s]uch coverage shall be for the life of the retiree." Thus, the analysis of the AFSCME contract for 2004–2006 as ambiguous would apply to all 60 contracts at issue.

January 1, 1983 ... shall receive hospital-medical insurance coverage to the same extent as active employees, *subject to the following conditions and exceptions:*

(a) The City will provide any eligible retired employee without claimed dependents the approved fee-for-service coverage or plan 2 coverage, whichever is designated by the employee at the time of retirement, provided active employees, without cost to the retiree.

(b) Effective December 31, 1987, for any such eligible retired employee with or without claimed dependents, the City will provide, without cost to the retiree, the approved fee-for-service coverage or plan 2 coverage, whichever is designated by the employee at the time of retirement, provided active employees. Effective with the approval of this contract by the City Council, for any such eligible retired employee with or without claimed dependents, the City will provide without cost to the retiree, the approved fee-for-service, (Plan 1), H.M.P. (Plan 2), Comprehensive Plan (Plan 3) or Plan 4 coverage provided to active employees. However, the approved fee-for-service coverage shall be subject to an annual deductible amount of $650. If no covered-plan participant receives benefits during a calendar year, any portion of the deductible amount which is accrued for services rendered in the last three calendar months of that calendar year shall be applied toward the deductible amounts for the following calendar year.

. . . .

(d) *Such coverage shall be for the life of the retiree,* but if the retiree dies before his or her spouse, such coverage shall be continued for such spouse until he or she dies or remarries, but any such coverage for such surviving spouse shall not include coverage for any dependent of such surviving spouse.

(e) Employees hired after February 1, 2001 and who retire and qualify for retiree health coverage shall receive benefits under the comprehensive plan (Plan 3) only. Any employee who qualifies for retiree hospital-medical insurance may voluntarily elect to retire under Plan 3, the comprehensive plan.

(Emphasis added.) Provisions (a) and (b) list specific plans from which the retired employee may choose. Provision (d) then states that "[s]uch coverage shall be for the life of the retiree."

The class argues that the term "active employees" in paragraph (a) refers to those employees who were employed at the time a particular class member retired, and the phrase "to the same extent as active employees" means that class members' health benefits are fixed and governed by the plan in place on the date of the class member's retirement. The City argues that the term "active employees" refers to those currently employed by the City, meaning the phrase "to the same extent as active employees" means that class members' benefits may be modified to the extent that health benefits for current employees are modified.

## II.

A promise by a public employer, embodied in a collective bargaining agreement, to pay health insurance premiums for an employee who retires during the term of the collective bargaining agreement is enforceable on contract grounds. *Hous. & Redev. Auth. of Chisholm v. Norman,* 696 N.W.2d 329, 337 (Minn.2005). A contract is ambiguous if its terms are reasonably susceptible to more than one interpretation. *Blattner v. Forster,* 322 N.W.2d 319, 321 (Minn.1982).

The construction and effect of an unambiguous contract presents a question of law for the court. *Trondson v. Janikula,* 458 N.W.2d 679, 681 (Minn.1990). The determination of whether a contract is ambiguous is also a question of law, but the interpretation of an ambiguous contract is a question of fact for the jury. *Denelsbeck v. Wells Fargo & Co.,* 666 N.W.2d 339, 346 (Minn.2003). CBAs are contracts, *see Norman,* 696 N.W.2d at 337, and their proper interpretation is subject to de novo review, *see Halla Nursery, Inc. v. City of Chanhassen,* 781 N.W.2d 880, 884 (Minn. 2010).

In determining whether the 60 CBAs at issue were ambiguous, the district court and the court of appeals considered only the term "active employees" (or perhaps the phrase "to the same extent as active employees"), which appears in all contracts. However, the question of whether a contract is ambiguous "depends, not upon words or phrases read in isolation, but rather upon the meaning assigned to the words or phrases in accordance with the apparent purpose of the contract as a whole." *Art Goebel, Inc. v. N. Suburban Agencies, Inc.,* 567 N.W.2d 511, 515 (Minn. 1997); *see also id.* ("The cardinal purpose of construing a contract is to give effect to the intention of the parties as expressed in the language they used in drafting the whole contract."); *Halla Nursery,* 781 N.W.2d at 884; *Emp'rs Mut. Liab. Ins. Co. of Wis. v. Eagles Lodge of Hallock, Minn.,* 282 Minn. 477, 479, 165 N.W.2d 554, 556 (1969).

Thus, the goal of contract interpretation here is not to figure out what the phrase "to the same extent as active employees" means in isolation. Rather, the goal is to discern what health benefit obligation the City of Duluth owes retired employees by interpreting the words or phrases of the CBAs in the context of the documents as a whole.

### A.

All 60 contracts at issue begin their discussion of hospital-medical insurance for retired employees by describing eligibility requirements. The paragraph is then followed by several subparts that describe the "conditions and exceptions" that apply to the employee's eligibility requirements. Typically, these may include requirements to purchase Medicare Part B, different plans and deductibles available for retired employees with or without dependents, and credits for sick leave not used before retirement. The specific "conditions and exceptions," however, vary from CBA to CBA.

Where the phrase "to the same extent as active employees" is specifically qualified as "subject to the following conditions and exceptions," it is reasonable to conclude that the obligations owed to retirees are *different* than those owed to current employees. In other words, the fact that each CBA was negotiated with varying terms and conditions could mean that retirees under *different* contract years were intended to collect *different* benefits under *different plans.*

Further, a contract that is "subject to the following conditions and exceptions" should be interpreted according to those conditions and exceptions. Some contracts contain terms and conditions that are inconsistent with the City being able to modify retirees' benefits whenever and however benefits for current employees are modified. For example, 11 of the 12 CBAs between the City and Confidential Employees[4] contain the following paragraph:

---

4. The only contract between the City and     Confidential Employees that does not contain

14.2 *Any person purchasing medical insurance coverage pursuant to a former, or this, agreement may continue to do so.* When any such person ceases to so purchase medical coverage, the employee shall no longer have any right to participate in any insurance plan or group created by this, or successor, labor agreement. This paragraph shall become inoperative when no former employee is buying insurance coverage as here provided.

(Emphasis added.) Each of the CBAs also specifies particular plans under which retired employees would be covered. It is reasonable to interpret paragraph 14.2 as fixing retired employees' rights to purchase medical insurance pursuant to the contract in effect at the time of retirement, thus limiting the changes available to the City in their obligations to those retired employees.

The City argues that all the clauses contained in the "conditions and exceptions" portion of the CBA are subordinate to the "active employees" clause, and are therefore not controlling. Under this interpretation, the CBAs require any plan for retirees first be offered to "active employees"; only after that requirement is met will the subsequently listed conditions and exceptions apply. However, the full "active employees" clause states health insurance benefits will be given "to the same extent as active employees, subject to the following conditions and exceptions." Any provision that follows the "active employees" clause is a "condition and exception"; it is not necessarily subordinate to the "active employees" clause. Interpreting the CBA in the way the City advances would read the word "exception" out of the

CBA. *Cf. Current Tech. Concepts, Inc. v. Irie Enters., Inc.,* 530 N.W.2d 539, 543 (Minn.1995) ("A contract must be interpreted in a way that gives all of its provisions meaning.").

### B.

In addition to the "terms and conditions" language discussed above, all 60 contracts between the City and its employees include the provision: "Such coverage shall be for the life of the retiree." This phrase occurs in each contract after previous paragraphs set out the types of coverage a retiring employee would receive. In some contracts, such as those between the City and Confidential Employees, the phrase is listed as a "condition and exception"; in others, such as those between the City and Fire Fighters Local 101, the phrase appears in a separate numbered paragraph.

To what coverage does "such coverage" refer? The phrase "[s]uch coverage shall be for the life of the retiree" likely refers to the *specific* coverage designated by the retiree under the previous terms and conditions paragraphs. The City's obligation is mandatory; the designated coverage *shall* be for the life of the retiree. Therefore, it would be reasonable to conclude that the City's obligation is fixed at the time of the employee's retirement when the employee chooses benefits. This interpretation would mean that the employee is limited to whichever plan he or she designated at the time of retirement, but is covered *under that plan* on whatever terms apply to then-active employees. The ability of the City to move all retirees to a different plan—on whatever terms—is therefore suspect.

paragraph 14.2 is the 1983 agreement, which contains a different paragraph providing for employees retiring before January 1, 1983, who received retirement benefits under a different scheme. Additionally, the 1984–1985 agreement has the identical paragraph numbered 14.6.

Another possible interpretation of this language would be that retirees are only allowed to receive the insurance benefits that current employees receive. Provision (a) could be interpreted as merely providing retirees a choice between two plans that were, at that time, provided to active employees. Therefore, if all current employees were shifted to one plan, retirees would also be shifted to that plan, because it is the only one available to "active employees." In other words, the insurance benefits available to retirees must, as a prerequisite, be provided to current employees. If the plan is no longer offered to current employees, this provision is no longer enforceable, and "such coverage" only refers to the City's general obligation to provide coverage.

Given that there are two reasonable interpretations, I would conclude that the contracts are ambiguous. This ambiguity is reinforced by an additional paragraph that appears in many of the CBAs. According to the 2000–2002 and 2003 contracts between AFSCME and the City, and the 2000–2001–2002 contract between Duluth Police Local and the City, employees hired after a certain date are eligible for "benefits under the comprehensive plan (Plan 3) only." This begs the question of what obligation the City retains if Plan 3 is eliminated for current employees. If "active employees" are current employees, then the City might argue it is only required to provide coverage under these CBAs if Plan 3 remains available to current employees; if Plan 3 is eliminated, the City might argue it can substitute any coverage provided current employees or cease coverage altogether for employees who retire after agreement approval, since the plan these retirees are limited to is no longer offered. If "active employees" are employees covered under the CBA at the time of retirement, the City might be required to continue Plan 3 coverage for these retirees even if current employees no longer retain Plan 3 coverage as an option.

Since the phrase "[s]uch coverage shall be for the life of the retiree," when read in conjunction with the remainder of the contracts relating to hospital-medical coverage for retirees, is susceptible to more than one reasonable interpretation, the contracts are ambiguous and should be remanded to the fact-finder for interpretation.

In sum, the contracts entered into between the City and AFSCME, Confidential Employees, Duluth Police Local, Fire Fighters Local 101, and Supervisory Association attempt to fix the City's obligation in providing hospital-medical insurance to retired employees. The nature and extent of the City's obligations are susceptible to more than one reasonable interpretation, and are thus ambiguous. This ambiguity occurs in two ways. First, the qualification of the "active employees" language with "conditions and exceptions" is ambiguous because conditions and exceptions make the City's obligations to retired employees different from the obligations owed to current employees. Second, the phrase "[s]uch coverage shall be for the life of the retiree" may indicate either that the City is obligated to provide only that coverage given to current employees, or that it must continue to give particular coverage to retirees. When contract language is ambiguous, summary judgment is inappropriate and contract interpretation becomes a question of fact for the jury. *Hickman v. SAFECO Ins. Co. of America*, 695 N.W.2d 365, 369 (Minn.2005). I would reverse the court of appeals and remand to the district court for trial.[5]

5. The district court signed an order on May 12, 2009, agreeing with the parties' stipula-

PAGE, Justice (dissenting).

Because I conclude that the contracts at issue are ambiguous, I join the dissents of both Justice Paul H. Anderson and Justice Helen M. Meyer.

tion that class treatment of the contract issue was appropriate. If the contracts were deemed ambiguous, the district court may have had to reconsider class status. *See* Minn. R. Civ. P. 23.03 (class status may be altered or amended before final judgment). However, the issue of class certification is not before the court, and thus need not be decided.